UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| INCODEL MICHIGAN, LLC,<br>    Plaintiff/Counter-Defendant,<br><br>v.<br><br>BLUE TECH GLOBAL, LLC,<br>    Defendant/Counter-Plaintiff. | Case No. 21-12208<br>Honorable Shalina D. Kumar<br>Magistrate Judge Anthony P. Patti |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 57) AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 58)

## I.    Introduction

This dispute involves two companies—plaintiff Incodel Michigan, LLC (Incodel) and defendant Bluetech Global, LLC (BTG)—in the business of supplying Ford Motor Company (Ford) with electrical automotive parts called wiring harnesses ("harnesses"). Incodel and BTG worked together to supply harnesses to Ford under related contracts that were intended to protect them from the risks of sharing assets, profits, and business opportunities. The contracts ultimately failed in this objective and, as a result, Incodel sued BTG, alleging a variety of contract, business tort, and intellectual property claims, and BTG countersued Incodel for breach of two separate contracts and unjust enrichment. ECF No. 41; ECF No. 52.

The parties filed cross motions for partial summary judgment. ECF Nos. 57, 58. The motions are fully briefed and do not need a hearing for decision. ECF Nos. 57-58, 62-63, 69-70; *see* E.D. Mich. LR 7.1(f)(2). For the reasons below, the Court grants in part and denies in part each motion.

## II.   Background

Incodel and BTG formally began their relationship by entering a Nondisclosure and Limited Noncompete Agreement ("NDA") executed in summer of 2019. ECF No. 58-2. Under the NDA, "one party may disclose (the 'Disclosing Party') Confidential information to the other (the 'Receiving Party')", but the Receiving Party may not use any confidential information provided by the Disclosing Party on its own behalf. ECF No. 58-2, PageID.1316.

The parties entered the NDA to pursue significant business supplying Ford with certain harnesses. At the time, Ford urgently needed to find a new supplier for over 600 harnesses that a company called PKC had previously supplied to Ford. ECF No. 58-4, PageID.1347; ECF No. 58-5, PageID.1354, 1356-57. Ford had a list of the over 600 harnesses (the "PKC list") that detailed the volume of each harness it needed. ECF No. 58-6. The PKC list included harnesses for a Ford vehicle platform called "P558" as well as for other vehicle platforms. *Id.*

By the time the parties entered the NDA, Incodel had already been a "Tier 1" supplier to Ford—that is, Incodel had already supplied various parts directly to Ford—for about three years. ECF No. 58-7, PageID.1374-77. At the same time, BTG had had no business with Ford, which had never heard of BTG. ECF No. 58-8, PageID.1390; ECF No. 57-4, PageID.1137.

On June 24, 2019, four days after BTG executed the NDA, a BTG design engineer emailed Ford that "Incodel is in the process of taking over the Ford Service Wire Harness business from PKC Group. BTG is working with Incodel in regard to wiring." ECF No. 58-9. Then, on July 1, 2019 a Ford representative issued a letter stating that Ford was "transferring manufacturing from PKC to Incodel" for "harness supply to Ford." ECF No. 58-10. According to the Ford representative, the PKC harness business transferred to Incodel included approximately 700 different harnesses. ECF No. 58-5, PageID.1354, 1356.

Soon after, in August 2019 Incodel and BTG entered the Strategic Alliance Agreement ("SAA") to supply Ford with "Products," which the SAA broadly defined as "P558 wiring harnesses and related items and any other electrical components added to this definition by mutual written approval." ECF No. 58-11, PageID.1408. Under the SAA, BTG's primary role was to

provide engineering support. *See id.*; ECF No. 58-8, PageID.1401. As

relevant here, the SAA contains the following key provisions:

- BTG would be "entitled to compensation of 40% of the Profit from the sale of Product." ECF No. 58-11, PageID.1412.

- Incodel has "the sole right to change, modify or discontinue sales of any of the Products" with "no obligation or liability to BTG." *Id.*

- Until two years after the SAA's termination, BTG would not promote or sell to Ford "either for its own account or as agent or BTG for another," "any product that is directly competitive to the Products." *Id.*

- Neither party has authority or may hold itself out as having authority to make any contract or representation on behalf of the other party. *Id.* at PageID.1411.

To avoid confusion as to "what [the parties] [we]re as a group," the

parties executed an addendum to the SAA. *See* ECF No. 57-12; ECF No.

57-4, PageID.1136-37; ECF No. 64-3. Under the addendum, Incodel

allowed BTG to use Incodel.com email addresses. *See* ECF No. 57-4,

PageID.1136; ECF No. 64-3. Consistent with BTG's engineering support

role under the SAA, the addendum expressly limited BTG's use of

Incodel.com email addresses to only engineering-related communications.

ECF No. 58-11, PageID.1408; ECF No. 64-3.

In order to supply harnesses to Ford, the parties had to select a

manufacturer. ECF No. 58-11, PageID.1408. They ultimately selected

Chongqing Minkang Industrial and Trade Co., LTD ("Minkang"), which

entered into a contract (the "MK agreement") with Incodel to manufacture the harnesses under the SAA. *See* ECF Nos. 62-3, 62-13. Although BTG's owner, Jun Lan, signed the MK agreement, the only parties to it are Minkang and Incodel. *See* ECF No. 62-13. Under the MK agreement, Incodel would purchase and store most of the raw materials and tooling to manufacture the harnesses covered by the SAA at Minkang, which in turn would use Incodel's raw materials and tooling to manufacture the harnesses. *See id.*; *see also* ECF Nos. 63-13, 58-11. The MK agreement contained an exclusivity, nonsolicit, and noncompete provision prohibiting Minkang from directly or indirectly supplying harnesses to Ford. *See* ECF No. 62-13.

The parties began supplying harnesses to Ford, focusing at first on the ten harnesses on the PKC list with the largest volumes (the "Top 10 harnesses"). ECF No. 58-15, PageID.1433. Later, in February 2021, the parties also started supplying an additional PKC-listed harness (the "Plus 1 harness"). ECF No. 58-8, PageID.1389; ECF No. 62-20, PageID.1702. The parties deposited their profits under the SAA in a joint bank account that required both parties to approve transfers from it. ECF No. 58-3, PageID.1321. They would withdraw profits from the account only as

"advance partial distributions" under subsequent written agreements. *See* ECF Nos. 58-12, 58-13, 58-14.

BTG also secured valuable harness work without Incodel. Ostensibly on Incodel's behalf but without Incodel's knowledge or involvement, BTG quoted the indirect supply to Ford of other PKC-listed harnesses through a direct supplier called Flex-N-Gate. *See* ECF No. 58-7, PageID.1384-85; ECF No. 58-4, PageID.1348, 1350. BTG obtained a purchase order from Flex-N-Gate for one of the harnesses, and without disclosing to Incodel the $125,000 value of the purchase order, transferred the purchase order to itself. ECF No. 58-17; *see* ECF No. 58-4, PageID.1349, 1351; ECF Nos. 64-1, 58-17, 57-14. Again without Incodel's knowledge or involvement, BTG also obtained for itself many purchase orders from another direct supplier, Hearn Industrial Services ("Hearn"), to supply Ford with PKC-listed harnesses. ECF No. 58-3, PageID.1342; *see* ECF No. 58-7, PageID.1383; ECF No. 58-18; ECF No. 58-8, PageID.1395-96. Facing a 22-week supply delay for certain raw materials and tooling needed to perform some of its work with Hearn, BTG suggested using Incodel's materials at Minkang; subsequently, BTG performed the work without the 22-week delay, and Incodel's materials at Minkang went missing. *See* ECF Nos. 65-1, 66-1; 65-4; 63-13.

In addition to receiving $125,000 for its work with Flex-N-Gate, BTG received millions in revenue for its work with Hearn, with at least $5 million coming from its work on two PKC-listed harnesses alone. *See* ECF Nos. 58-17, 58-19, 63-21, 64.

BTG's procurement of harness work without Incodel prompted Incodel to initiate this action on September 20, 2021. ECF No. 1. Incodel brings the following claims: violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1839 (Count I); violation of the Michigan Uniform Trade Secrets Act, M.C.L. § 445.1902 (Count II); breach of contract based on the SAA and MK agreement (Count III); tortious interference with a contract (Count IV); tortious interference with a business expectancy (Count V); conversion (Count VI); violation of the Lanham Act, 15 U.S.C. § 1125 (Count VII); trademark infringement (Count VIII); civil conspiracy (Count IX); and breach of the NDA (Count X). ECF No. 41.

In response, BTG filed counterclaims for breach of contract based on the SAA (Count I), unjust enrichment (Count II), and breach of contract based on the NDA (Count III). ECF No. 52.

Both parties now seek summary judgment: BTG seeks summary judgment on all of Incodel's claims, ECF No. 57; Incodel does the same on all of BTG's counterclaims, ECF No. 58. Incodel also seeks summary

judgment on whether "Products" under the SAA includes not just the Top
10 and Plus 1 harnesses but, at a minimum, all harnesses on the PKC list.
*Id.*

### III.    Standard of Review

When a party files a motion for summary judgment, it must be
granted "if the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is
genuinely disputed must support the assertion by: (A) citing to particular
parts of materials in the record . . . ; or (B) showing that the materials cited
do not establish the absence or presence of a genuine dispute, or that an
adverse party cannot produce admissible evidence to support the fact."
Fed. R. Civ. P. 56(c)(1).

In reviewing a motion for summary judgment, the court must "view the
factual evidence and draw all reasonable inferences in favor of the non-
moving party." *Williams v. Mauer*, 9 F.4th 416, 430 (6th Cir. 2021) (citation
omitted). Further, the court may not "weigh the evidence and determine the
truth of the matter" at the summary judgment stage. *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 249 (1986). The ultimate question for the court
to determine "is whether the evidence presents a sufficient factual

disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne v. Novartis Pham. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).

The moving party bears the initial burden of "informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citation omitted). If the moving party carries its burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the non-moving party must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the [non-movant].'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (E.D. Mich. 2004). Mere allegations or denials of the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

"When, as here, there are cross-motions for summary judgment, the Court considers them separately, and it is not necessary that either party is

entitled to summary judgment; it is possible that neither party meets its burden." *Peatross v. Liberty Mutual Personal Ins. Co.*, 575 F. Supp. 3d 887, 891 (E.D. Mich. 2021) (citing *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021)). When considering the plaintiff's motion, the evidence is viewed in the light most favorable to the defendant, and the burden is on the plaintiff to show that it is entitled to judgment as a matter of law. *Id*. The opposite is true when considering the defendant's motion. *Id*.

The court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Indeed, "it is not for the court to search the record and construct arguments. Parties must do that for themselves.*" Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017) (declining to consider party's arguments when it left "it to the court to seek out the relevant law, identify the relevant evidence, and develop their argument for them"); *see also, e.g.*, *Lyngaas v. Curaden* AG, No. 17-10910, 2021 WL 6049428, at *3 (E.D. Mich. Dec. 21, 2021) ("Where a party fails to explain an argument and supply authority . . . a court need not attempt to supply the missing information."). Accordingly, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived"—"[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (quotations and alterations omitted).

## IV.   Analysis

### A. BTG's Motion for Partial Summary Judgment

#### i.   Breach of the SAA (Count III by Incodel)

Incodel alleges that BTG breached the SAA's noncompete clause by working with Hearn to obtain harness purchase orders from Ford.[1] It is undisputed that BTG and Hearn supplied Ford with harnesses that were within the PKC list but outside the Top 10 harnesses. But the parties dispute whether BTG was permitted to do so under the SAA's noncompete clause.

The SAA's noncompete clause provides that "[BTG] will not promote or sell to Customer . . . any product that is directly competitive to the

---

[1] Incodel also alleges that BTG violated the SAA's confidentiality clause and various clauses of the MK Agreement through its work with Hearn. ECF No. 41, PageID.750. BTG provides no argument as to the alleged SAA confidentiality violation, but it does argue that it did not breach the MK Agreement because it was not a party to that agreement. Incodel fails to address this argument, "effectively conced[ing] the issue" on summary judgment. *Eid v. Wayne State Univ.*, 599 F. Supp. 3d 513, 532 (E.D. Mich. 2022), *aff'd,* (6th Cir. Mar. 15, 2023). Accordingly, BTG is entitled to summary judgment on Incodel's claim for breach of the MK Agreement.

Products . . . ." ECF No. 58-11, PageID.1412. It defines "Products" as "the P558 wiring harness and related items and any other electrical components added to this definition by mutual written approval." *Id.* at PageID.1408. The SAA is silent as to whether "Products" covers the non-Top 10 yet PKC-listed harnesses from the BTG-Hearn work.  If it does, BTG breached the SAA with its Hearn work.

When interpreting a contract, courts must "determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning." *In re Smith Tr.*, 745 N.W.2d 754, 757-58 (Mich. 2008). "If the contractual language is unambiguous, courts must interpret and enforce the contract as written because an unambiguous contract reflects the parties' intent as a matter of law." *Id.* "A contract is ambiguous only if its language is reasonably susceptible to more than one interpretation." *Cole v. Ladbroke Racing Mich., Inc.*, 614 N.W.2d 169, 176 (Mich. Ct. App. 2000). "[I]f the language of a contract is ambiguous, courts may consider extrinsic evidence to determine the intent of the parties." *Shay v. Aldrich*, 790 N.W.2d 629, 637 (Mich. 2010).

BTG argues that the term "P558 wiring harness" in the definition of "Products" is ambiguous but that extrinsic evidence shows no genuine dispute that the term means only the Top 10 harnesses. Incodel argues

that "Products" unambiguously includes all PKC-listed harnesses, not just the Top 10 harnesses. The Court agrees.

The SAA defines "Products" broadly. "Products" includes "the P558 wiring harness." ECF No. 58-11, PageID.1408. It is undisputed that "P558" is a platform for Ford Super-Duty trucks. *See, e.g.*, ECF No. 58-23. "Products" also includes items "related" to the P558 harnesses. ECF No. 58-11, PageID.1408. Courts have held that the term "related" is "very broad" and means "connected in some manner." *Sigma Fin. Corp. v. Am. Int'l Specialty Lines Ins. Co.*, 200 F. Supp. 2d 697, 704 (E.D. Mich. 2001). Therefore, as Incodel argues, "Products" unambiguously includes harnesses for the P558 platform and any other harnesses "connected in some manner" to them. *See id.*

The parties do not dispute that all PKC-listed harnesses are connected in some manner to the P558 harnesses. Indeed, that connection exists because, when Incodel and BTG entered into the SAA, Ford urgently needed to find a new supplier for the PKC-listed harnesses, including those for the P558 platform, which had all been previously supplied by Ford's former supplier, PKC. ECF No. 58-4, PageID.1347; ECF No. 58-5, PageID.1354, 1356-57; ECF No. 58-6.  The PKC-listed and P558 harnesses are also connected because the parties understood that BTG

was working with Incodel on harnesses that Incodel "t[ook] over . . . from PKC," including those for the P558 platform.  ECF No. 58-9; *see* ECF No. 58-10; ECF No. 58-5, PageID.1354, 1356.

Because "Products" unambiguously includes harnesses for the P558 platform and all PKC-listed harnesses are "connected in some manner" to the harnesses for the P558 platform, "Products" under the SAA includes, at a minimum, all harnesses on the PKC list, not just the Top 10 harnesses.

Without any authority, BTG counters that "'P558 wiring harness' is ambiguous on its face." ECF No. 57, PageID.1099; ECF No. 62, PageID.1544. BTG asserts, for the first time in its reply brief, that the term is "open to multiple interpretations, and no person could understand the scope or meaning of said term by simply reading the SAA." ECF No. 70, PageID.2095.

Assuming that BTG did not waive its argument with its late, perfunctory assertion, *see McPherson*, 125 F.3d at 995-96; *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010), BTG fails to persuade the Court that "P558 wiring harness," and by extension "Products," is ambiguous. Even if the SAA does not by itself indicate what "P558 wiring harness" means, it is "reasonably susceptible" to just one interpretation—harnesses for the Ford Super-Duty truck platform. *Cole*, 614 N.W.2d at 176. BTG

offers no other reasonable interpretation that would permit the Court to examine BTG's evidence outside the SAA's four corners. *See Shay*, 790 N.W.2d at 637.

BTG alternatively argues that even if it supplied "Products" to Ford by working with Hearn, Incodel modified the SAA's noncompete clause such that the SAA allowed BTG to supply "Products" as a Tier 2 (*i.e.*, indirect) supplier working with Tier 1 (*i.e.*, direct) suppliers like Hearn.

A contract, including a written contract, may be modified orally or in writing. *Kloian v. Domino's Pizza, L.L.C.*, 733 N.W.2d 766, 771 (Mich. Ct. App. 2006). Parties may modify a contract only through mutual intent. *See Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003). "The mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement . . . establishing mutual agreement to waive the terms of the original contract." *Id.* "In meeting this clear and convincing burden, a party advancing amendment must establish that the parties mutually intended to modify the *particular* original contract . . . ." *Id.*

BTG's only evidence purporting to show Incodel's intent to modify the SAA's noncompete clause is an email from Incodel's owner, Frank Yang, to an independent sales representative. *See* ECF No. 64-1. In response to the

sales representative's request for Incodel's approval for BTG to work with Hearn, Yang stated, "On the tier 2 jumper, revenue less than 50K$ and a Tier 2 business, I am not interested of [sic] doing the project at this time and if you and [BTG's] Jun can work out a deal with other Tier 1, it would be Ok to me. . . . [A]t this time [Incodel] would not be interested as a tier 2 unless the project fits Incodel [sic] business model." *Id.*

Viewing the evidence in a favorable light for Incodel, the Court finds that the email is not "clear and convincing" proof that Incodel intended to modify the SAA's noncompete clause to allow the BTG-Hearn work. *Quality Prods.*, 666 N.W.2d at 258. The email does not indicate specific intent from Incodel to modify the SAA's noncompete clause because it does not mention the SAA in particular. Although "Ok to me" indicates that Incodel gave permission to BTG to take on certain harness work, the email's references to "*the* tier 2 jumper," "*the* project," and "revenue less than 50k$" show that Incodel limited its permission to a single harness and project worth less than $50,000. Further, the email shows that Incodel gave BTG permission only to take on Tier 2 work that would not "fit Incodel['s] business model." BTG does not dispute that its work supplying PKC-listed harnesses with Hearn—work that provided BTG with more than $5 million in revenue for only two harnesses, *see* ECF Nos. 63-21, 64—would have fit

Incodel's business model, thereby exceeding the scope of Incodel's permission and breaching the SAA's noncompete clause as a result.

In any case, Incodel's evidence creates a fact issue as to whether it intended to modify the SAA's noncompete clause to allow such high value work as the BTG-Hearn work. BTG admitted that the email reads as if Incodel would have been interested in Tier 2 work worth more than $50,000, such as the BTG-Hearn work. ECF No. 63-5, PageID.1766; *see* ECF Nos. 64, 64-1. And Incodel in fact understood that at the time of the email, it gave BTG permission only to work on just one sub-$50,000 project with Hearn. *See* ECF No. 63-4, PageID.1747. Based on this evidence, as well as the limited permission from the terms of Incodel's email, a reasonable jury could conclude that Incodel had no intent to modify the SAA's noncompete clause to allow work such as the BTG-Hearn work.

In sum, "Products" under the SAA includes, at a minimum, all PKC-listed harnesses, such as those BTG and Hearn supplied to Ford, and the evidence does not show that Incodel modified the SAA's noncompete clause to allow the BTG-Hearn work. Accordingly, BTG is not entitled to summary judgment on Incodel's SAA breach claim, and Incodel is entitled to summary judgment as to the meaning of "Products" under the SAA.

### ii.   Breach of the NDA (Count X by Incodel)

Incodel alleges that BTG breached the NDA by obtaining harness purchase orders from Ford with Hearn and Flex-N-Gate. BTG presents four arguments attempting to show that Incodel's NDA breach claim fails. Each argument is unavailing.

First, BTG argues that the parties agreed under the SAA that "all prior . . . agreements," including the NDA, "shall be of no force or effect." ECF No. 57, PageID.1106; ECF No. 58-11, PageID.1414. BTG copied this argument verbatim from its June 24, 2022 response to Incodel's motion for leave to file its amended complaint. *Compare id.* ("The [NDA] is the only written agreement between the Parties that existed prior to the SAA. As such, when they executed the SAA, the Parties agreed that the [NDA] 'shall be of no force or effect.'"), *with* ECF No. 25, PageID.439 (stating the same). The Court rejected that argument before, *see* ECF No. 39, PageID.731, and BTG provides no reason why the Court should not reject it again. "In the absence of 'convincing reasons,' a court generally will not revisit an issue previously decided by it in the litigation." *Sudberry v. Warden, S. Ohio Corr. Facility*, 626 F. Supp. 2d 767, 780 (S.D. Ohio 2008) (quoting *Gillig v. Advanced Cardiovascular Sys.*, 67 F.3d 586, 589-90 (6th Cir. 1995)). The

Court, therefore, declines to revisit the issue of whether the SAA nullified the NDA.

BTG asserts as its second and third arguments, respectively, that the NDA does not prohibit BTG from obtaining purchase orders with other suppliers and that Incodel gave BTG permission to work with other Tier 1 suppliers. The Court finds these arguments undeveloped and thus deems them waived. As to BTG's second argument, BTG merely asserts but fails to show how the NDA permits BTG to obtain purchase orders with other suppliers such that it did not breach the NDA by working with Hearn and Flex-N-Gate. As to its third argument, BTG does not explain how Incodel gave BTG permission to pursue work with Hearn and Flex-N-Gate such that BTG "could not possibly have breached the NDA." ECF No. 57, PageID.1107. Even if the Court assumes BTG again argues modification, BTG only developed a modification argument with respect to the SAA and the BTG-Hearn work—not the NDA and BTG's work with Hearn or Flex-N-Gate. *See supra* Section IV.A.i. The Court need not attempt to develop BTG's second and third arguments for BTG and deems them waived. *See Lyngaas*, 2021 WL 6049428, at *3; *McPherson*, 125 F.3d at 995-96.

Last, BTG argues for the first time in its reply brief that Incodel has no evidence that BTG used any confidential information in violation of the

NDA. But BTG waived this argument as well because it did not make the argument in its initial summary judgment brief, depriving Incodel of the chance to respond. *See Sanborn*, 629 F.3d at 579.

Because none of BTG's arguments as to Incodel's NDA breach claim are availing, BTG is not entitled to summary judgment on the claim.

### iii.    Trade Secret Claims (Counts I & II by Incodel)

Incodel claims that BTG misappropriated certain trade secret information, in violation of the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1839 (Count I), and the Michigan Uniform Trade Secrets Act (MUTSA), M.C.L. § 445.1902 (Count II). ECF No. 41, PageID.740-49 (listing specific materials for at least eight trade secret information categories).

BTG asserts that Incodel cannot specifically identify any viable trade secret to maintain its trade secret claims. The DTSA and the MUTSA follow the same standards for determining what constitutes a trade secret. *Prudential Def. Sols., Inc. v. Graham*, No. 20-11785, 2020 WL 7706617, at *3 (E.D. Mich. Dec. 29, 2020) (citing *RGIS, LLC v. Gerdes*, 817 F. App'x 158, 162 (6th Cir. 2020)). For information to be a trade secret, the information must "derive independent economic value from not being generally known to others" and "the employer [must] take reasonable steps

to protect the confidentiality of the information." *Kelly Servs. v. Eidnes*, 530 F. Supp. 2d 940, 951 (E.D. Mich. 2008) (citing M.C.L. § 445.1901 *et seq.*).

An alleged trade secret must be identified "clearly, unambiguously, and with specificity." *FCA US LLC v. Bullock*, 446 F. Supp. 3d 201, 212 (E.D. Mich. 2020) (citing *Utilase, Inc. v. Williamson*, 188 F.3d 510 (Table) (6th Cir. 1999)). Pricing schemes, markups, contract details, and vendor information may be trade secrets even if all of the information can be obtained through publicly available means so long as the information is not readily ascertainable. *See Kelly Servs.*, 530 F. Supp. 2d at 951; *Giasson Aero. Sci., Inc. v. RCO Eng'g, Inc.*, 680 F. Supp. 2d 830, 843 (E.D. Mich. 2010).

Here, Incodel identifies specific materials that it claims contain or constitute trade secrets. *See* ECF No. 41, PageID.740-49 (identifying, for example, "the Imported Materials Processing Agreement between IM and MK, Tool Order 12172019MIN-A, Appendix E materials list, Appendix A P558 Battery Cable Service Parts, and Amendment 3 to Imported Materials Processing Agreement dated 3-13-2020"). Incodel's designee testified that the materials contain pricing information; its supplier list; the details in its supplier contracts, including its materials and tooling lists; its material lists, tooling sheets, tooling master sheet, and raw material inventory; its tooling

contracts; and its financial information, all of which may constitute trade secrets. *See* ECF No. 63-17; ECF No. 41, PageID.745-47; *see Kelly Servs.*, 530 F. Supp. 2d at 951.

But according to BTG, certain materials are not trade secrets because Incodel neither created nor owns them. BTG does not adequately explain or provide any authority for its argument, and the Court "need not attempt to supply th[at] missing information." *Lyngaas*, 2021 WL 6049428, at *3. BTG also asserts that Incodel only generically identifies its trade secrets. However, Incodel specifically identified all the materials at issue and testified as to what materials contain or constitute claimed trade secrets. *See* ECF No. 63-17. Without more, the Court finds that BTG is not entitled to summary judgment on Incodel's trade secret claims.

### iv. Tortious Interference Claims (Counts IV & V by Incodel)

Incodel claims that BTG tortiously interfered with the MK Agreement between Incodel and Minkang (Count IV) and with Incodel and Minkang's related business expectancy (Count V) by soliciting Minkang to supply Incodel's raw materials, components, and tooling to BTG, in violation of various clauses of the MK Agreement.

A claim for tortious interference with a contract requires a plaintiff to establish "(1) the existence of a contract, (2) a breach of the contract, and

(3) an unjustified instigation of the breach by the defendant." *Prudential Def. Sols., Inc. v. Graham*, 498 F. Supp. 3d 928, 941 (E.D. Mich. 2020) (citing *Health Call v. Atrium Home & Health Care Servs.*, 706 N.W.2d 843, 848 (Mich. Ct. App. 2005)). A claim for tortious interference with a business expectancy requires "(1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted." *Id.* (citing *Health Call*, 706 N.W.2d at 849).

BTG argues that it did not interfere with the Incodel-Minkang relationship because BTG worked with a different manufacturer for the BTG-Hearn work. Incodel counters that BTG induced Minkang to breach the MK agreement by using Incodel's raw materials for the harnesses BTG supplied in violation of the SAA. The Court agrees, based on the undisputed facts and Incodel's evidence.

Incodel's evidence shows that BTG induced Minkang to breach the MK agreement by using Minkang to supply Incodel's raw materials for the BTG-Hearn work. Among other harnesses supplied to Ford, BTG and

Hearn supplied "XL34" harnesses. ECF No. 63-13; ECF No. 64, PageID.1920. To do so, BTG needed Incodel's raw materials and suggested using them at Minkang because BTG's raw materials supply for the XL34 harnesses was delayed by 22 weeks, as shown in June 2021 emails from BTG. *See* ECF Nos. 65-1, 66-1. Despite BTG's supply issues, BTG's invoice shows that it shipped the XL34 harnesses in December 2021—sooner than was possible with a 22-week raw materials delay. *See* ECF No. 65-4. In addition, much of Incodel's raw materials inventory at Minkang went missing, including 64% and 20% of its inventory for two XL34 harness parts, respectively. ECF No. 63-13. Based on this evidence, a reasonable fact finder could find that BTG used Minkang to supply Incodel's raw materials for Ford harnesses. In that case, BTG would have induced Minkang to breach the MK agreement because it is undisputed that the MK agreement prohibited Minkang from supplying BTG with raw materials for Ford harnesses. *See* ECF No. 63-19.

This fact issue as to whether BTG used Incodel's raw materials for Ford harnesses such that BTG induced Minkang to breach the MK agreement precludes summary judgment on Incodel's tortious interference claims.

### v.    Conversion (Count VI by Incodel)

Incodel claims that BTG converted Incodel's raw materials, components, and tooling at Minkang for BTG's own use in supplying harnesses to Ford. Under Michigan law, conversion is "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc. v. Columbian Distribution Servs., Inc.*, 871 N.W.2d 136, 144 (Mich. 2015) (internal quotation marks omitted).

BTG argues that Incodel's conversion claim fails because Incodel cannot identify any property BTG took and because BTG and Minkang both testified that BTG took no raw materials from Minkang. But as the Court determined in Section IV.A.iv above, there is circumstantial evidence showing that BTG used Minkang to supply Incodel's raw materials—specifically, XL34 harness materials—for the BTG-Hearn work. Accordingly, the evidence suggesting that BTG took Incodel's raw materials at Minkang for the BTG-Hearn work creates a question of fact sufficient to defeat BTG's motion for summary judgment on Incodel's conversion claim.[2]

---

[2] BTG also asserts that the economic loss doctrine bars Incodel's conversion claim because the raw materials and tooling at issue are "non cash assets" under the SAA. *See* ECF No. 58-11, PageID.1410. But BTG does not explain how the raw materials and tooling at issue constitute "non cash assets" under the SAA and how the economic loss doctrine might

Accordingly, BTG is not entitled to summary judgment on Incodel's conversion claim.

### vi.   Trademark Claims (Counts VII & VIII by Incodel)

Incodel asserts claims for false designation of origin under the Lanham Act, 15 U.S.C. § 1125 (Count VII), and common law trademark infringement (Count VIII), based on BTG's alleged use of Incodel's trademarks to receive harness work from Flex-N-Gate for itself.

To establish § 1125 liability for false designation of origin, a plaintiff must show (1) the false designation has a substantial effect on interstate commerce; and (2) the false designation creates a likelihood of confusion. *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998) (citing *Lyon v. Quality Courts United, Inc.*, 249 F.2d 790, 795 (6th Cir. 1957)). To establish liability for common law trademark infringement, a plaintiff must show (1) the plaintiff used a valid mark before the defendant used its allegedly infringing mark; and (2) the defendant's allegedly infringing mark was likely to confuse consumers. *Janet Travis, Inc. v. Preka Holdings, L.L.C.*, 856 N.W.2d 206, 212 (Mich. Ct. App. 2014). For trademark claims like Incodel's, courts recognize consent as a valid affirmative defense. *See,*

---

apply. Because BTG fails to develop this argument, the Court deems the argument  waived. *See McPherson*, 125 F.3d at 995-96.

*e.g.*, *Chrysler Corp. v. Newfield Publ'ns*, 880 F. Supp. 504, 512 (E.D. Mich. 1995).

BTG asserts consent as an affirmative defense to Incodel's trademark claims, arguing that Incodel consented to BTG's use of Incodel.com email addresses to secure work from Flex-N-Gate. ECF No. 57, PageID.1104. Incodel argues that it provided no such consent. Based on the evidence before it, the Court agrees.

BTG's evidence shows that Incodel wanted to clarify its business relationship with BTG, ECF No. 57-12, and BTG wanted the same because Ford had never heard of BTG before the parties' work on the Top 10 harnesses. *See* ECF No. 57-4, PageID.1137. To that end, the parties executed an addendum to the SAA. *Id.*; ECF No. 64-3.

Under the addendum, Incodel allowed BTG to use Incodel.com email addresses but expressly limited BTG's use of Incodel.com email addresses to engineering-related communications, not sales communications like those BTG made to secure work from Flex-N-Gate. *See* ECF No. 57-4, PageID.1136; ECF Nos. 64-3, 64-4. Further, the SAA prohibits BTG from making any contract—like the purchase order with Flex-N-Gate—or representation on behalf of Incodel, and it prohibits BTG from using Incodel's marks without consent except as necessary to carry out the

Page **27** of **35**

SAA's terms. ECF No. 58-11, PageID.1411, 1413; *see* ECF No. 58-17. And because Incodel did not otherwise know about or was involved with BTG's sales communications to Flex-N-Gate and the subsequent purchase order from Flex-N-Gate, the evidence does not support BTG's consent defense.[3] *See* ECF No. 58-7, PageID.1384-85; ECF No. 58-4, PageID.1348, 1350. Accordingly, BTG is not entitled to summary judgment on Incodel's trademark claims.

### vii.  Civil Conspiracy (Count IX by Incodel)

Incodel brings a claim for civil conspiracy based on its tortious interference and conversion claims. "Civil conspiracy is not a claim of its own; it is necessary to prove a separate, actionable tort." *Prudential*, 498 F. Supp. 3d at 943 (quoting *Advoc. Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003)). BTG argues that Incodel's civil conspiracy claim fails because Incodel's tort claims—that is, its tortious interference and conversion claims—also fail. Because the Court has rejected BTG's arguments that Incodel's underlying tort claims

---

[3] BTG has the burden of proof on its affirmative defense of consent. *See Fonseca v. CONRAIL*, 246 F.3d 585, 590 (6th Cir. 2001). As a result, BTG is not entitled to summary judgment on its consent defense where, as here, the evidence presents fact issues as to the defense. *See, e.g.*, *Beck-Wilson v. Principi*, 441 F.3d 353, 365 (6th Cir. 2006).

fail, it likewise rejects that BTG is entitled to summary judgment on Incodel's civil conspiracy claim. *See supra* Sections IV.A.iv-v.

## B. Incodel's Motion for Partial Summary Judgment

### i. Breach of the SAA (Count I by BTG)

BTG brings a counterclaim for breach of contract based on Incodel's alleged failure to distribute profits under the SAA and alleged refusal to fulfill purchase orders under the SAA. Incodel challenges both bases of BTG's counterclaim,[4] and the Court analyzes each in turn.

### 1. Profit Distributions

BTG alleges that Incodel breached the SAA by failing to approve a profit distribution to BTG "as required" under the SAA. ECF No. 52, PageID.1024; *see also* ECF No. 58-3, PageID.1321 (stating profit distributions require both parties' approval).

---

[4] Incodel also challenges whether BTG may claim its unreturned capital contribution under the SAA as damages for its SAA breach counterclaim. Incodel argues, and BTG does not dispute, that BTG is entitled to a return of its capital contribution upon the SAA's termination, which has yet to occur. But Incodel's argument is a non-sequitur. That BTG would be entitled automatically to a return of its capital contribution upon the SAA's termination does not foreclose the possibility that BTG could also claim its unreturned capital contribution as damages for its SAA breach counterclaim. Incodel does not address this facet of BTG's claim. Accordingly, the Court denies summary judgment on this issue.

It is undisputed that the SAA has no provision about when profits must be distributed. Under Michigan law, "when a contract is silent as to time of performance or payment, absent any expression of a contrary intent, the law will presume a reasonable time." *Subramanyam v. KLM Royal Dutch Airlines*, No. 20-11296, 2021 WL 1592664, at *5 (E.D. Mich. Apr. 23, 2021) (quoting *Jackson v. Est. of Green*, 771 N.W.2d 675, 694 (Mich. 2009)). "Indulgence of that presumption . . . merely gives effect to what it is reasonable to assume the parties intended when no contrary intention appears *on the face of the instrument*." *Duke v. Miller*, 355 Mich. 540, 543, 94 N.W.2d 819, 821 (1959) (emphasis added).

Incodel argues that the parties expressed a contrary intent for profits to be distributed within a reasonable time. Incodel explains that the parties intended that profits would be distributed only upon the SAA's termination unless they mutually agreed to an advance partial profit distribution. To support its argument, Incodel relies on advance partial profit distribution agreements which the parties executed or prepared in 2020 and 2021. *See* ECF Nos. 58-12, 58-13, 58-14.

However, Incodel fails to explain how the parties' advance partial profit distribution agreements qualify as an "expression of a contrary intent." *Subramanyam*, 2021 WL 1592664, at *5. The Court cannot assume so

because Michigan courts determine contrary intent by reference to "the face of the [contract]," not by reference to other contracts or extrinsic evidence. *Duke*, 94 N.W.2d at 821. And Incodel cannot argue contrary intent by reference to the SAA because, as it admits, the SAA on its face indicates nothing about profit distribution timing. Without more, Incodel may not rely on extrinsic evidence such as the advance partial profit distribution agreements to establish the parties' contrary intent to profit distributions within a reasonable time. *See also Gordon v. Great Lakes Bowling Corp.*, 171 N.W.2d 225, 230 (1969) ("Parol evidence is not admissible to show time of performance where a written contract is complete and unambiguous but does not mention time, because a reasonable time is presumed.").

Because "what constitutes a reasonable amount of time" to distribute profits under the circumstances of this case is "necessarily a factual question," Incodel is not entitled to summary judgment on BTG's SAA breach counterclaim to the extent it is based on profit distribution timing.

### 2. Purchase Order Fulfillment

BTG alleges that Incodel breached the SAA by "refusing to honor recent orders from Ford for the Products" and failing to notify BTG of the same. ECF No. 52, PageID.1024.

Incodel disputes whether it refused to fulfill Ford purchase orders but alternatively argues that even if that were true, the SAA expressly permits Incodel to stop supplying harnesses at any time with no obligation or liability to BTG. Indeed, the SAA expressly provides that Incodel has "the sole right to change, modify or discontinue sales of any of the Products" and "shall incur no obligation or liability to BTG" by exercising that right. ECF No. 58-11, PageID.1411.

BTG counters that under the SAA, Incodel "must first provide BTG with 'two months [sic] notice prior to the discontinuance of any Product,'" ECF No. 62, PageID.1539 (quoting ECF No. 62-5), and that Incodel failed to provide such notice. But BTG does not explain the interplay between the notice provision and the SAA's unambiguous provision that Incodel has "no obligation or liability to BTG" for its decisions regarding harness orders. Even if, under the notice provision, Incodel needed to provide BTG with two months' notice before refusing Ford purchase orders under the SAA, Incodel would still have "no obligation or liability to BTG" for refusing the purchase orders. The provisions do not conflict, and the Court must enforce them as written. *See Quality Prods.*, 666 N.W.2d at 259. Accordingly, Incodel is entitled to summary judgment on BTG's SAA breach counterclaim to the extent it is based on purchase order fulfillment.

### ii.   Unjust Enrichment (Count II by BTG)

BTG brings a counterclaim for unjust enrichment based on Incodel's alleged retention of profit from the Plus 1 harness. Under Michigan law, a claim for unjust enrichment requires the court to imply a contract between the parties—"[h]owever, a contract will be implied only if there is no express contract covering the same subject matter." *Johnson Controls, Inc. v. Jay Indus.*, 459 F.3d 717, 730 (6th Cir. 2006) (*Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003)).

Here, the SAA covers the same subject matter as BTG's unjust enrichment claim—namely, the parties' Plus 1 harness sales. As the Court finds above, the SAA covers all harnesses on the PKC list. *See supra* Section IV.A.i. And the parties do not dispute that the PKC list includes the Plus 1 harness. *See* ECF Nos. 69-2, 69-6. Because the Plus 1 harness falls within the SAA's scope, the Court cannot imply a contract under an unjust enrichment theory, and BTG's claim fails. *See Johnson Controls*, 459 F.3d at 730. Accordingly, Incodel is entitled to summary judgment on BTG's unjust enrichment claim.

### iii.   Breach of the NDA (Count III by BTG)

BTG claims that Incodel breached the NDA by using BTG's confidential information to pursue harness work outside of the SAA without

BTG's involvement. Incodel argues that BTG's claim fails because BTG cannot present any evidence that Incodel used BTG's confidential information in breach of the NDA.

According to Incodel, the NDA authorizes the use of confidential information for "a prospective or actual business relationship between Incodel and [BTG]," ECF No. 58-2, PageID.1316, and it acted within such authorization by only using BTG's confidential information at issue to quote harnesses while it worked with BTG, *see* ECF No. 58-15, PageID.1432. Incodel supports its argument with evidence that the parties understood the NDA to authorize the manner in which Incodel used BTG's confidential information. *See* ECF No. 58-3, PageID.1328-29.

BTG fails to address Incodel's argument, conceding the issue as a result. *See Eid*, 599 F. Supp. 3d at 532. Accordingly, Incodel is entitled to summary judgment on BTG's NDA breach counterclaim. *See Jasper v. Ford Motor Co.*, No. 09-11119, 2010 WL 11706840, at *5 (E.D. Mich. Oct. 22, 2010) (granting summary judgment because "Plaintiff does not address Defendant's arguments").

## V.   Conclusion

For the reasons above, BTG's motion for partial summary judgment (ECF No. 57) is **GRANTED IN PART** and **DENIED IN PART**. The Court

**GRANTS** BTG's motion as it relates to Incodel's claim for breach of contract based on the MK agreement (Count III) and **DISMISSES** that claim. The Court **DENIES** the remainder of BTG's motion. Incodel's remaining claims against BTG are for violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1839 (Count I); violation of the Michigan Uniform Trade Secrets Act, M.C.L. § 445.1902 (Count II); breach of contract based on the SAA (Count III); tortious interference with a contract (Count IV); tortious interference with a business expectancy (Count V); conversion (Count VI); violation of the Lanham Act, 15 U.S.C. § 1125 (Count VII); trademark infringement (Count VIII); civil conspiracy (Count IX); and breach of the NDA (Count X). These claims proceed to trial.

Further, Incodel's motion for partial summary judgment (ECF No. 58) is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** Incodel's motion as to and **DISMISSES** the following counterclaims by BTG: breach of the SAA based on purchase order fulfillment (Count I); unjust enrichment (Count II); and breach of the NDA (Count III). The Court **DENIES** Incodel's motion as to BTG's counterclaim for breach of the SAA based on profit distributions (Count I), which proceeds to trial.

s/ Shalina D. Kumar
SHALINA D. KUMAR
Dated: March 8, 2024                     United States District Judge